965 F.Supp. 96 (1997)
The LEAGUE OF WOMEN VOTERS, et al., Plaintiffs,
v.
G. William DIAMOND, et al., Defendants.
Civ. No. 96-0052-B.
United States District Court, D. Maine.
February 19, 1997.
*97 Stephen E.F. Langsdorf, Preti, Flaherty, Beliveau & Pachios, Augusta, ME, David Soley, Bernstein, Shur, Sawyer & Nelson, Portland, ME, for Plaintiffs.
Thomas D. Warren, Attorney Generals Office, Augusta, ME, for State Defendants.
John Hubbard Rich, III, Perkins, Thompson, Hinckley & Keddy, Portland, ME, for Governmental Reform.
Samuel W. Lanham, Jr., Cuddy & Lanham, Bangor, ME, Stephen J. Safranek, Detroit, MI, for U.S. Term Limits.

ORDER AND MEMORANDUM OF DECISION
BRODY, District Judge.
Plaintiffs, the League of Women Voters, the Maine Counsel of Senior Citizens, two Maine state legislators, and four Maine voters, challenge the constitutionality of the Maine Term Limitation Act of 1993 (hereinafter "the Act"). 21-A M.R.S.A. §§ 551-554 (Supp.1995). Plaintiffs seek to prevent enforcement of the Act by Defendants, G. William Diamond, the former Maine Secretary of State, and Andrew Ketterer, the Maine Attorney General (hereinafter "Governmental Defendants").[1] Intervenor Defendants, U.S. Term Limits, Inc. and the Committee for Governmental Reform, joined the case in support of the Governmental Defendants. Plaintiffs and the Governmental Defendants filed motions for summary judgment. Intervenor Defendants each filed memoranda in support of the Governmental Defendants' Motion for Summary Judgment.
For the reasons discussed below, Plaintiffs' Motion for Summary Judgment is denied and Defendants' Motion for Summary Judgment is granted.

I. Background
The factual background of this case is largely set forth in the Court's April 8, 1996, Order denying Plaintiffs' Motion for Preliminary Injunction (hereinafter "Preliminary Injunction Order"). See League of Women Voters v. Diamond, 923 F.Supp. 266 (D.Me. 1996), aff'd per curiam, 82 F.3d 546 (1st Cir.1996). The facts related therein are supplemented here to the extent necessary to update this case to its current posture.
The Act imposes a limitation of four consecutive terms in office on various state officials, including all members of Maine's bicameral legislature. See 21-A M.R.S.A. § 553. Plaintiffs' Complaint contains four counts challenging this new limitation on public service. Count I alleges that the Act violates Maine's Constitution because a limitation on the terms of Maine's law makers cannot be accomplished by citizen initiative or legislation but, rather, requires amendment to the Maine Constitution. Counts II and III allege that the Act violates the First and Fourteenth Amendments to the U.S. Constitution as well as 42 U.S.C. § 1983. The final Count, Count IV, requests a declaratory judgment that the Act be applied only prospectively so that each law maker begins accruing terms toward the Act's four term limitation with service in the 118th Legislature.
This Court certified two questions to the Maine Law Court to resolve the state law claims, Counts I and IV. In September of 1996, the Law Court concluded that a state constitutional amendment is not required to impose term limits on state legislators and that the Act disqualified state legislators who had served four consecutive terms in office as of the November 1996 election, i.e., retroactive application is appropriate. League of *98 Women Voters v. Secretary of State, 683 A.2d 769 (Me.1996). Since Maine's highest court determined these matters of state law, only the federal constitutional claims, Counts II and III, are currently before the Court.

II. Summary Judgment
Plaintiffs and Defendants have filed cross motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Summary judgment is appropriate in the absence of a genuine issue of any material fact, when the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Facts may be drawn from "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits." Id. The parties agree that no controversies regarding the material facts of this case remain. The only remaining decision is whether Maine's term limits law is constitutional. This is a matter of law for the Court.

III. Federal Constitutional Claims

A. Legal Framework
There has been little change in the legal landscape of this area of constitutional law since the Court's Preliminary Injunction Order. Whether state term limit laws violate voters' and candidates' First and Fourteenth Amendment rights has not been decided by the Supreme Court. See U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 784, 836, 115 S.Ct. 1842, 1846, 1871, 131 L.Ed.2d 881 (1995). This Court must rely, therefore, on the Supreme Court's determination in Burdick v. Takushi, 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992), and its predecessors. The Court is also aided by many well reasoned determinations issued by both the federal and state court systems.
It is undisputed that there are few rights more precious than the right to vote for the candidate of one's choice as well as the concurrent right to compete for the privilege to represent one's constituency in a state legislature.[2] The Supreme Court has stated that:
Both [the right of individuals to associate for the advancement of political beliefs and the right to cast a vote effectively] rank among our most precious freedoms. We have repeatedly held that the freedom of association is protected by the First Amendment. And of course this freedom protected against federal encroachment by the First Amendment is entitled under the Fourteenth Amendment to the same protection from infringement by the States. Similarly we have said with reference to the right to vote: "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined."
Williams v. Rhodes, 393 U.S. 23, 30-31, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968) (quoting Wesberry v. Sanders, 376 U.S. 1, 17, 84 S.Ct. 526, 534-35, 11 L.Ed.2d 481 (1964)); see also Illinois State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 184, 99 S.Ct. 983, 990, 59 L.Ed.2d 230 (1979) ("[V]oting is of the most fundamental significance under our constitutional structure."); Yick Wo v. Hopkins, 118 U.S. 356, 370, 6 S.Ct. 1064, 1071, 30 L.Ed. 220 (1886) (right to vote is "preservative of all rights"). However, despite the importance of the right to vote and run for office, such fights cannot be exercised in any manner that the voter or the politician desires. Under the Constitution, states retain the power to regulate and control their elections. See Gregory v. Ashcroft, 501 U.S. 452, 463, 111 S.Ct. 2395, 2402, 115 L.Ed.2d 410 (1991) ("The authority of the people of the states to determine the qualifications of their most important governmental officials ... lies `at the heart of representative government.'"); Munro v. Socialist Workers Party, 479 U.S. 189, 199, 107 S.Ct. 533, 539-40, 93 L.Ed.2d 499 (1986); Tashjian v. Republican Party of Connecticut, 479 U.S. 208, *99 217, 107 S.Ct. 544, 550, 93 L.Ed.2d 514 (1986); Sugarman v. Dougall, 413 U.S. 634, 647, 93 S.Ct. 2842, 2850, 37 L.Ed.2d 853 (1973). In addition, there is no fight to vote for a particular candidate. E.g., Burdick v. Takushi, 937 F.2d 415, 419 (9th Cir.1991), aff'd, 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) ("Although Burdick is guaranteed an equal voice in the election of those who govern, Burdick does not have an unlimited right to vote for any particular candidate.") The question is, therefore, at what point does a state's right to regulate its elections give way to the voters' and candidates' First and Fourteenth Amendment rights of speech and association?
In Burdick, the Supreme Court considered whether Hawaii's complete prohibition of write-in voting unreasonably infringed upon its citizens' rights under the First and Fourteenth Amendments. In holding that this prohibition did not violate these Amendments to the Constitution, the Court issued its most recent pronouncement on how courts are to assess the constitutionality of state regulation of voting for state officers. The Burdick Court started with the premise that "[e]lection laws will invariably impose some burden upon individual voters." Burdick, 504 U.S. at 433, 112 S.Ct. at 2063. All rules regulating the election process, whether designating balloting locations, dictating the requisite age of eligible candidates, or imposing residency requirements, limit in some way the voters' and law makers' right to vote and right to associate with others for political ends. See id. There is no dispute that such regulations are legitimate and must be complied with by all wishing to participate in a state's electoral system.
The Burdick Court next determined that the standard to be applied to First and Fourteenth Amendment voting cases is the "flexible standard" promulgated in Anderson v. Celebrezze, 460 U.S. 780, 789-792, 103 S.Ct. 1564, 1570-72, 75 L.Ed.2d 547 (1983).[3]Anderson presented a First and Fourteenth Amendment challenge to an Ohio filing deadline that kept certain independent candidates off the ballots. Id., at 782, 103 S.Ct. at 1566-67. Anderson set forth a balancing test that weighs the magnitude of the asserted infringement on a plaintiff's First and Fourteenth Amendment rights against the interests asserted by the state justifying the burden imposed by its law. Id. at 789, 103 S.Ct. at 1570. The Anderson Court stated that:
a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it must also consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all of these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.
Id. (citing Williams v. Rhodes, 393 U.S. 23, 30-31, 89 S.Ct. 5, 10-11, 21 L.Ed.2d 24 (1968); Bullock v. Carter, 405 U.S. 134, 142-143, 92 S.Ct. 849, 855-56, 31 L.Ed.2d 92 (1972); American Party of Texas v. White, 415 U.S. 767, 780-781, 94 S.Ct. 1296, 1305-06, 39 L.Ed.2d 744 (1974); Illinois State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 183, 99 S.Ct. 983, 989-90, 59 L.Ed.2d 230 (1979)). The Court, therefore, concluded in Anderson that no one test, such as strict scrutiny or rational basis, can be applied to First and Fourteenth Amendment voting cases. The test is flexible, and a court's determination must be based on the significance and extent of the infringement on the citizens' interests balanced against the state's proffered rationale for its election law.
In Burdick, the Court further refined the Anderson test. The Court stated that *100 when a state's election law subjects a plaintiff's rights to severe restrictions, the regulation must be "`narrowly drawn to advance a state interest of compelling importance.'" Burdick, 504 U.S. at 434, 112 S.Ct. at 2063 (quoting Norman v. Reed, 502 U.S. 279, 289, 112 S.Ct. 698, 705-06, 116 L.Ed.2d 711 (1992)). However, when a state's election law "imposes only `reasonable, nondiscriminatory restrictions' upon" a plaintiffs First and Fourteenth Amendment rights, the state's "`important regulatory interests are generally sufficient to justify' the restrictions." Id. (quoting Anderson, 460 U.S. at 788, 103 S.Ct. at 1569-70). As this Court stated in its Preliminary Injunction Order, Burdick establishes that if the state's election law imposes a severe restriction, it will be subjected to strict scrutiny review, while a reasonable, nondiscriminatory restriction subjects the law to the less rigorous Anderson balancing test, i.e., rational basis review. See also Clements v. Fashing, 457 U.S. 957, 968, 102 S.Ct. 2836, 2846, 73 L.Ed.2d 508 (1982) (when interference with ballot access is insignificant, only "rational predicate" must be shown to survive challenge); Stiles v. Blunt, 912 F.2d 260, 262-266 (8th Cir.1990), cert. denied, 499 U.S. 919, 111 S.Ct. 1307, 113 L.Ed.2d 241 (1991).

B. Standard of Review
The Supreme Court has not determined a standard for use in deciding when a state's restrictive election law moves from being reasonable to severe. However, a synthesis of the law in this area reveals certain key indicators that the Court examines in making this determination. The most significant recurring factors are whether the restriction is content based or content neutral and the extent to which alternate routes to ballot access minimize the restriction on the plaintiff's rights.

1. Content of State Election Law
Whether a challenged election law is content based or content neutral has a significant impact on a court's determination of whether the law is constitutional. See Burdick, 504 U.S. at 438, 112 S.Ct. at 2066 (upheld prohibition on write-in voting stating that "there is nothing content based about a flat ban on all forms of write-in ballots"). The Court has stated that the burden is significant "for the state to justify a restriction that limits political participation by identifiable political group whose members share a particular viewpoint, associational preference, or economic status." Anderson, 460 U.S. at 793, 103 S.Ct. at 1572. The Court went even further, stating that:
courts quite properly "have more carefully appraised the fairness and openness of laws that determine which political groups can place any candidate of their choice on the ballot."
Id. at 793 n. 15, 103 S.Ct. at 1572 n. 15 (quoting L. Tribe, American Constitutional Law, 774 and n. 2 (1st ed. 1978)). Generally, election laws that can be characterized as content based will be subjected to strict scrutiny. E.g., McDaniel v. Paty, 435 U.S. 618, 629, 98 S.Ct. 1322, 1329, 55 L.Ed.2d 593 (1978); Cipriano v. City of Houma, 395 U.S. 701, 704, 89 S.Ct. 1897, 1899-1900, 23 L.Ed.2d 647 (1969).
There is one type of content based election law that bears mentioning separately. A law that excludes new or minority views from the ballot will be held subject to a higher level of scrutiny. See, e.g., Anderson, 460 U.S. at 793, 103 S.Ct. at 1572; Illinois State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 184-185, 187, 99 S.Ct. 983, 990-91, 59 L.Ed.2d 230 (1979) (invalidating signature requirement on independent candidates and new political parties); Bullock v. Carter, 405 U.S. 134, 144, 92 S.Ct. 849, 856, 31 L.Ed.2d 92 (1972) (invalidating filing fees for candidates); Turner v. Fouche, 396 U.S. 346, 362-363, 90 S.Ct. 532, 541-42, 24 L.Ed.2d 567 (1970) (rejecting property ownership requirement for school board members where prima facie case of racial discrimination had been shown); Williams v. Rhodes, 393 U.S. 23, 31, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968) ("No extended discussion is required to establish that the Ohio laws before us give the two old, established parties a decided advantage over any new parties struggling for existence and thus place substantially unequal burdens on both the right to vote and the right to associate."). *101 Professor Tribe summarized this area stating that:
Constitutional review of election and campaign regulation amounts, in large part, to accommodate the fear of a temporary majority entrenching itself with the necessity of making the election a readable barometer of the electorate's preferences. It is not surprising, therefore, that the rigor of judicial review of election laws has been roughly proportioned to their potential for immunizing the current leadership from successful attack.
L. Tribe, American Constitutional Law, 1097 (2nd ed. 1988). If the election law in question has the effect of immunizing the current leadership at the expense of new or minority views, the Court's precedent demonstrates little tolerance. Such laws are subjected to strict scrutiny and, generally, held unconstitutional.

2. Ballot Access
Another factor that the Court examined closely in Burdick is the extent to which Hawaii provided alternative means of ballot access. Burdick, 504 U.S. at 435-437, 112 S.Ct. at 2064-65. The Court explained in detail three different ways that a candidate can get on the ballot in Hawaii, finally concluding that Hawaii's system provides liberal access to the ballot, therefore, the burden imposed by the prohibition on write-in voting is "a very limited one." Id. at 437, 112 S.Ct. at 2065. The Court indicated in Burdick that easy alternative access minimized the burden imposed by Hawaii's prohibition on write-in voting. The Court weighed the cumulative effect that the state's ballot access laws had on plaintiff's First and Fourteenth Amendment rights, including the prohibition on write-in voting, to determine whether Hawaii's voting regime, as a whole, was unconstitutionally restrictive.

C. Standard for Review of Maine's Term Limitation Act
In assessing Maine's term limits law in light of these factors, the Court concludes that the appropriate standard of review is the more flexible Anderson balancing analysis. As noted above, the Supreme Court has not had the opportunity to assess the constitutionality of term limits for state law makers.[4]
Plaintiffs claim that term limits are a content based restriction because candidates are excluded from running for office because of "their prior service and ideas expressed in the legislature." Plaintiffs' Cross-Motion for Summary Judgment at 11 (Nov. 12, 1996). In support of this proposition, Plaintiffs cite numerous cases where the Supreme Court applied strict scrutiny review to situations where one class of candidates or voters was treated differently from another class. Cases such as Hill v. Stone, 421 U.S. 289, 297-298, 95 S.Ct. 1637, 1642-43, 44 L.Ed.2d 172 (1975) (state law requiring that voting on city bond issue be restricted to residents who have taxable personal property held unconstitutional); Dunn v. Blumstein, 405 U.S. 330, 336-337, 92 S.Ct. 995, 999-1000, 31 L.Ed.2d 274 (1972) (Tennessee residency requirement impermissibly treated citizens differently in a manner not justified by the state's proffered interests); Bullock v. Carter, 405 U.S. 134, 142-144, 92 S.Ct. 849, 855-56, 31 L.Ed.2d 92 (1972) (filing fee for candidates, when no other means of access to ballot was offered, held unconstitutional); Evans v. Cornman, 398 U.S. 419, 422, 90 S.Ct. 1752, 1754-55, 26 L.Ed.2d 370 (1970) (Maryland law excluding people living on grounds of the National Institutes of Health, a federal enclave located in Maryland, from voting held unconstitutional); Cipriano v. *102 City of Houma, 395 U.S. 701, 704, 89 S.Ct. 1897, 1899-1900, 23 L.Ed.2d 647 (1969) (city election limiting the franchise in certain special elections to property taxpayers held unconstitutional); and Kramer v. Union Free School District No. 15, 395 U.S. 621, 625-626, 89 S.Ct. 1886, 1888-89, 23 L.Ed.2d 583 (1969) (New York Education law requiring that a person wishing to vote in school district elections be either an owner or lessor of taxable property within the district, or parent or custodian of a child attending school within the district, held unconstitutional) do, in fact, overturn various election laws on First or Fourteenth Amendment grounds under the Court's strict scrutiny analysis. However, no party to this case, and certainly not this Court, disputes these determinations. These cases simply present different situations than the one before the Court here. All of these Supreme Court cases were either explicitly content based or had the effect of excluding certain specific groups or persons, such as independent candidates (Anderson), indigent candidates (Lubin v. Panish, 415 U.S. 709, 716-718, 94 S.Ct. 1315, 1320-21, 39 L.Ed.2d 702 (1974)), or candidates with a religious background (McDaniel v. Paty, 435 U.S. 618, 629, 98 S.Ct. 1322, 1329, 55 L.Ed.2d 593 (1978)).
The Act is not content based. As this Court stated in the Preliminary Injunction Order, Maine's term limits law makes no distinctions on the basis of wealth, party affiliation, race, or ideas. Plaintiffs argue that the Act discriminates against incumbent law makers as a class, and, based on this discrimination, strict scrutiny must be applied. Plaintiffs state that their:
rights to support experience and knowledge gained through extensive service in the legislature are no less important than their fights to support "new ideas" and independent candidates.
Plaintiffs' Cross-Motion for Summary Judgment at 11 (Nov. 12, 1996). Plaintiffs' argument is not in accord with the Supreme Court's Burdick test. The level of review of election laws depends on the extent of the infringement on voting fights. Although one type of content based laws that concern the Court is that discussed above that restricts new ideas or minority groups or parties, to categorize five term incumbents in this category of content based election laws is to turn the Court's precedent on its head. Almost any election law burdens some identifiable group, such as young people, noncitizens, or nonresidents. The fact that some specific category of people is temporarily disenfranchised is not determinative of which level of review to apply. The question is whether the restriction is reasonable or severe. The Act is a complete prohibition on all types of candidates. Under the Act, a law maker who has served four terms in one house of the Maine legislature must sit out at least one term in that house. This is true without regard to the law maker's ideas, gender, race, religion, or any other classification within which he or she may fall. This restriction is unlike the content based restrictions that the Court has subjected to strict scrutiny.
The next factor that the Supreme Court has used to determine the level of scrutiny to be applied to state election laws is the extent to which there is alternative means of ballot access. Plaintiffs claim that the Act imposes a complete ban on service by termed out incumbents, hence strict scrutiny applies. Plaintiffs state that voters supporting such termed out candidates are prohibited from casting an effective vote in the state elections.[5] Despite Plaintiffs' claims, the Act does not limit ballot access to a significant extent. There are numerous examples of cases where more significant restrictions have been upheld as constitutional. In Sununu v. Stark, 420 U.S. 958, 95 S.Ct. 1346, 43 L.Ed.2d 435 (1975), aff'g, 383 F.Supp. 1287 (D.N.H.1974), for example, the Court affirmed the district court's decision that a seven year residency requirement for state *103 senators was constitutional. The district court in Sununu determined that this seven year prohibition did not significantly interfere with either the potential candidate's rights or the rights of those wishing to vote for him. Sununu, 383 F.Supp. at 1291-1292.
The Act does not impose a complete prohibition on incumbents. Candidates may sit out for the required two years and run in the next election or they may run for a different state office. In addition, voters who support termed out candidates and are dissatisfied with their remaining choices may place candidates who they believe will effectively represent them on the primary ballot by simply collecting 25 signatures on a primary petition for state representatives and 100 signatures for state senators. See 21-A M.R.S.A. § 335(5)(F)-(G) (1993). Such voters also may place independent candidates for state representative on the general ballot by collecting 50 signatures. See id. § 354(5)(G). Independent candidates for state senator may be placed on the ballot in the same manner by collecting 200 signatures. See id. § 354(5)(F). Given that there is no constitutional right to run for office or to vote for a specific candidate, Maine's system is quite liberal in allowing numerous avenues for ballot access to candidates with all views from all walks of life. It may, in fact, be more open than the system upheld in Burdick.
Despite the fact that over half the states have gubernatorial term limits and over one-third have enacted term limits on state legislators, no court has overturned term limits on state officers under First and Fourteenth Amendment challenge.[6] One case, however, deserves specific note. In Bates v. Jones, 904 F.Supp. 1080, 1096 (N.D.Cal.1995), a district court examined California Proposition 140, which imposes a lifetime limitation of two terms on state senators and three terms for state legislators. Id. at 1085. The Bates court felt that the voter plaintiffs demonstrated a severe infringement on their First and Fourteenth Amendment rights. Id. at 1096. However, the Bates court also stated that "there is no authority finding any state term limits [law] unconstitutional." Id. The court finally determined that the plaintiffs did not successfully establish a likelihood of success on the merits, hence no preliminary injunction issued against enforcement of Proposition 140. Id. at 1097.
California Proposition 140 is sufficiently different from the Act to make Bates of limited value to the Court. Where Proposition 140 imposes a lifetime ban on law makers who have reached the extent of their allowed service, Maine's term limits law requires only a one term waiting period before the candidate can seek reelection for the same office.[7] Given the other options that Maine offers for ballot access, the Act does not impose a severe restriction on Plaintiffs' First and Fourteenth Amendment rights.
Maine's Act is neither content based nor impermissibly restrictive. Given that the courts are to subject election laws to strict scrutiny only when they impose a severe burden on a plaintiff's First and Fourteenth Amendment rights, strict scrutiny is inappropriate in this case. Therefore, the rational *104 basis test will be applied. Under the Court's Burdick and Anderson standard, the state's regulatory interests will be balanced against the injury to Plaintiffs' First and Fourteenth Amendment rights. Burdick, 504 U.S. at 434, 112 S.Ct. at 2063-64.

D. State's Interests
Given that strict scrutiny is inappropriate in this case, Defendants need not establish "a compelling interest to tip the constitutional scales in [their] direction." Id. at 439, 112 S.Ct. at 2066. Only a "legitimate" regulatory interest need be established in support of the Act. See id. at 440, 112 S.Ct. at 2066-67. Defendants offered six interests served by the term limits imposed under the Act: first, to reduce unfair advantage of incumbents at the polls; second, to promote fairer and more competitive elections; third, to encourage qualified new candidates to run for office; fourth, to dislodge entrenched political leadership; fifth, to curb the power of political machines; and sixth, to encourage service by citizen representatives, rather than career politicians. Sufficient evidence was presented regarding the extremely high reelection rates of incumbent law makers created by the power of public office, name recognition, and other factors, to support the significant advantage of incumbents over challengers. As this Court noted in the Preliminary Injunction Order, a number of state courts have also concluded that incumbents enjoy an advantage over challengers. U.S. Term Limits, Inc. v. Hill, 316 Ark. 251, 872 S.W.2d 349, 359-360 (1994), aff'd, 514 U.S. 779, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995); Legislature of the State of California v. Eu, 54 Cal.3d 492, 286 Cal.Rptr. 283, 816 P.2d 1309, 1322-1329 (1991), cert. denied, 503 U.S. 919, 112 S.Ct. 1292, 117 L.Ed.2d 516 (1992); State ex rel. Maloney v. McCartney, 159 W.Va. 513, 223 S.E.2d 607, 611-613 (1976), appeal dismissed, 425 U.S. 946, 96 S.Ct. 1689, 48 L.Ed.2d 190 (1976).
The recent history of Maine's state elections clearly demonstrates the power of incumbency. An affidavit submitted to the Court by Julie Flynn, the Director of Corporations and Elections for the Maine Secretary of State's Office, documents the resilience of Maine's incumbent law makers. In the 12 years prior to 1993, the year the Act was passed, almost 99 percent of the incumbent legislators running for reelection in the primary elections won their races. Over 92 percent held their seats in the general elections.
While not passing on the relative merits of term limits on state officers, the Court is satisfied that Defendants sustained their burden of demonstrating that their legitimate regulatory interests outweigh the burden on Plaintiffs' First and Fourteenth Amendment rights. See Anderson, 460 U.S. at 788-789, 103 S.Ct. at 1569-70.

IV. Conclusion
Maine's term limits law, 21-A M.R.S.A. §§ 551-554 (Supp.1995), does not impermissibly violate Plaintiffs' First and Fourteenth Amendment rights. Plaintiffs' Motion for Summary Judgment is, therefore, DENIED and Defendants' Motion for Summary Judgment is GRANTED. No fees or costs are awarded.
SO ORDERED.
NOTES
[1] Mr. Diamond's term as Secretary of State expired in January 1997. Daniel A. Gwadosky became the Secretary of State for Maine on January 3, 1997.
[2] The right to vote and the right to run for elective office, to a significant extent, are intermingled. See Bullock v. Carter, 405 U.S. 134, 143, 92 S.Ct. 849, 856, 31 L.Ed.2d 92 (1972) ("[T]he rights of voters and the rights of candidates do not lend themselves to neat separation; laws that effect candidates always have at least some theoretical, correlative effect on voters."). The Court, therefore, will deal with the voter Plaintiffs' and the candidate Plaintiffs' claims in largely the same manner.
[3] The Court has determined that the right to run for elective office is not a fundamental right triggering strict scrutiny. See, Bullock v. Carter, 405 U.S. 134, 142-143, 92 S.Ct. 849, 855-56, 31 L.Ed.2d 92 (1972); see also Burdick, 504 U.S. at 433-434, 112 S.Ct. at 2063-64.
[4] In the recent U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) decision, the Court interpreted Article I, §§ 2 and 3, of the Constitution, to prohibit states from enacting term limits for Federal Senators and Congressmen because states are without authority to set substantive qualifications for federal legislators. Thornton is, therefore, largely inapplicable to the First and Fourteenth Amendment challenge before the Court here.

It is, however, noteworthy that the four Justice dissent in Thornton states that term limit measures have tended to survive First and Fourteenth Amendment review "without difficulty." Thornton, 514 U.S. at 925, 115 S.Ct. at 1913 (citing Moore v. McCartney, 425 U.S. 946, 96 S.Ct. 1689, 48 L.Ed.2d 190 (1976)).
[5] Neither the right to run for elective office nor the right to vote for a particular candidate exists under law. See, e.g., Bullock v. Carter, 405 U.S. 134, 142-143, 92 S.Ct. 849, 855-56, 31 L.Ed.2d 92 (1972); Burdick v. Takushi, 937 F.2d 415, 419 (9th Cir.1991), aff'd, 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992); Stiles v. Blunt, 912 F.2d 260, 266 (8th Cir.1990), cert. denied, 499 U.S. 919, 111 S.Ct. 1307, 113 L.Ed.2d 241 (1991); Zielasko v. Ohio, 873 F.2d 957, 961 (6th Cir.1989).
[6] Numerous federal and state courts have upheld term limits as constitutional. Dutmer v. City of San Antonio, 937 F.Supp. 587 (W.D.Tex.1996) (term limits for city counsel members upheld under First and Fourteenth Amendment challenge); Miyazawa v. City of Cincinnati, 825 F.Supp. 816, 819-822 (S.D.Ohio 1993), aff'd, 45 F.3d 126 (6th Cir.1995) (limit of four terms for city counsel members upheld under First and Fourteenth Amendment challenge); Nevada Judges Ass'n. v. Lau, 112 Nev. 51, 910 P.2d 898, 900-903 (1996) (limit of two terms for elected judges upheld under First and Fourteenth Amendment challenge); Legislature of the State of California v. Eu, 54 Cal.3d 492, 286 Cal.Rptr. 283, 296-303, 816 P.2d 1309, 1322-1329 (1991), cert. denied, 503 U.S. 919, 112 S.Ct. 1292, 117 L.Ed.2d 516 (1992) (two term lifetime limit for state senators and three terms for state representatives upheld under First and Fourteenth Amendment challenge); Maddox v. Fortson, 226 Ga. 71, 172 S.E.2d 595, 596-599 (1970), cert. denied, 397 U.S. 149, 90 S.Ct. 999, 25 L.Ed.2d 183 (1970) (one term limit for governor upheld under First and Fourteenth Amendment challenge).
[7] This Court declines, in any way, to speculate regarding how the Bates analysis that Proposition 140 imposes a severe restriction on plaintiffs' constitutional rights would withstand Ninth Circuit or Supreme Court review. The Court is not endorsing or criticizing Bates. Bates is, however, sufficiently distinct from the situation presented by the Act that it is of limited value in the Court's decision.